UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MELISSA SUE UMBARGER, | |
| Petitioner, | Case No. 1:14-cv-00003-CWD |
| v. | **MEMORANDUM DECISION AND ORDER** |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Respondent. | |

Before the Court is Melissa Umbarger's Petition for Review of the Respondent's

denial of social security benefits, filed January 6, 2014. (Dkt. 2.) The Court has reviewed

the Petition for Review and the Answer, the parties' memoranda, and the administrative

record (AR), and for the reasons that follow, will affirm the decision of the

Commissioner.

## PROCEDURAL AND FACTUAL HISTORY

Petitioner filed an application for a period of disability and disability insurance

benefits on June 8, 2011. Petitioner also filed an application for supplemental security

income on June 27, 2011. The applications allege disability beginning September 20,

2010, due to cognitive, neurological, mental health, and physical impairments. Both applications were denied initially and on reconsideration, and a hearing was held on October 3, 2012, before Administrative Law Judge (ALJ) John T. Molleur. After hearing testimony from Petitioner and vocational expert, Beth Cunningham, ALJ Molleur issued a decision finding Petitioner not disabled on October 26, 2012. Petitioner timely requested review by the Appeals Council, which denied her request for review on December 12, 2013. Petitioner appealed this final decision to the Court. The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

At the time of the hearing, Petitioner was 32 years of age. Petitioner's education is disputed. According to a report from psychologist Glena D. Andrews, Petitioner finished high school and received her diploma. But, according to Petitioner's testimony at the hearing before the ALJ, she has completed only through the ninth grade and did not obtain a GED. Petitioner's prior work experience includes convenience store clerk, motel housekeeper, and fruit packer.

## SEQUENTIAL PROCESS

The Commissioner follows a five-step sequential evaluation for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, it must be determined whether the claimant is engaged in substantially gainful activity. The ALJ found Petitioner had not engaged in substantial gainful activity since her alleged onset date, September 20, 2010. At step two, it must be determined whether the claimant suffers from a severe impairment. The ALJ found Petitioner had the following severe

limitations: sacroiliac dysfunction, headaches, history of a seizure disorder, learning

disorder, bipolar disorder, depression, and substance abuse in remission. However, the

ALJ found Petitioner's cognitive disorder not otherwise specified, history of anorexia and

bulimia, anxiety, post-traumatic stress disorder, borderline personality disorder, vision

issues, and insomnia not severe within the meaning of the Regulations.

Step three asks whether a claimant's impairments meet or equal a listed

impairment. The ALJ found that Petitioner's impairments did not meet or equal the

criteria for the listed impairments. The ALJ found Petitioner's: (1) sacroiliac dysfunction

does not meet the requirements of Listing 1.04; (2) headaches are not specifically

included in the Regulations and therefore neither meet nor equal a listing; (3) seizures do

not meet a listing because there is no medical evidence to document Petitioner's history

of seizures after the alleged onset date; (4) bipolar disorder and depression do not meet

the requirements of Listing 12.04; (5) learning disorder does not meet the requirements of

Listing 12.05; (6) substance abuse in remission does not meet the requirements of Listing

12.09; and (7) mental impairments, considered singly and in combination, do not meet or

equal the criteria of Listings 12.04, 12.05, and 12.09. If a claimant's impairments do not

meet or equal a listing, the Commissioner must assess the claimant's residual functional

capacity and determine, at step four, whether the claimant has demonstrated an inability

to perform past relevant work.


At step four, the ALJ found Petitioner able to perform light work as defined in 20

C.F.R. 404.156(b) and 416.967(b), "except she is unable to climb ropes, ladders, and scaffolds; she must avoid work at unprotected heights; she is limited to work involving simple, routine, repetitive tasks; she cannot have production quotas such as with piecework; and she is limited to brief and incidental contact with members of the general public." (AR 25.) Considering these limitations, the ALJ found Petitioner capable of performing past relevant work as a motel housekeeper. Accordingly, the ALJ did not proceed to step five,[1] because Petitioner did not demonstrate an inability to perform past relevant work.

## STANDARD OF REVIEW

Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). An individual will be determined to be disabled only if her physical or mental impairments are of such severity that she not only cannot do her previous work but is unable, considering her age, education, and work experience, to engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

---

[1] At step five, if the claimant demonstrates an inability to perform past relevant work, the burden shifts to the Commissioner to demonstrate that the claimant retains the capacity to make an adjustment to other work that exists in significant levels in the national economy, after considering the claimant's residual functional capacity, age, education, and work experience.

On review, the Court is instructed to uphold the decision of the Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports the petitioner's claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Id.* It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

When reviewing a case under the substantial evidence standard, the Court may question an ALJ's credibility assessment of a witness's testimony; however, an ALJ's

credibility assessment is entitled to great weight, and the ALJ may disregard a claimant's self-serving statements. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Where the ALJ makes a careful consideration of subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled role as the judge of credibility will be upheld as based on substantial evidence. *Matthews v. Shalala*, 10 F.3d 678, 679–80 (9th Cir. 1993).

## DISCUSSION

Petitioner takes issue with two aspects of the ALJ's decision. First, Petitioner contends the ALJ's lacked clear and convincing evidence to find that Petitioner's allegations of impairment were not fully credible. Second, Petitioner argues the ALJ failed to fully develop the record because he did not order a consultative examination or fully address Petitioner's physical impairments. The Court addresses each of these issues, in turn, below.

**1.     Credibility Assessment**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ's findings must be supported by specific, cogent reasons. *Id.* If a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints of pain based solely on lack of medical evidence. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005); s*ee also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (holding that an ALJ may not discredit a

claimant's subjective testimony on the basis that there is no objective medical evidence that supports the testimony). Unless there is affirmative evidence showing that the claimant is malingering, the ALJ must provide clear and convincing reasons for rejecting pain testimony. *Burch*, 400 F.3d at 680. General findings are insufficient; the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Reddick*, 157 F.3d at 722.

The reasons an ALJ gives for rejecting a claimant's testimony must be supported by substantial evidence in the record. *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1296 (9th Cir. 1999). If there is substantial evidence in the record to support the ALJ's credibility finding, the Court will not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 957, 959 (9th Cir. 2002). When the evidence can support either outcome, the Court may not substitute its judgment for that of the ALJ. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

The ALJ may engage in ordinary techniques of credibility evaluation, including considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony, or between claimant's testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties concerning the nature, severity and effect of the symptoms of which claimant complains. *Thomas v. Barnhart*, 278 F.3d 947, 958–59 (9th Cir. 2002). Also, the ALJ may consider the location, duration and frequency of symptoms; factors that precipitate and aggravate those symptoms; the amount and side effects of medications; and treatment measures

taken by the claimant to alleviate those symptoms. *See* SSR 96-7p.

Here, Petitioner argues that ALJ Molleur did not provide a clear and convincing reason for finding her testimony regarding the intensity, persistence, and limiting effects of her symptoms not fully credible. Petitioner contends that, because ALJ Molleur did not indicate evidence of malingering and because ALJ Molleur made only general findings regarding Petitioner's credibility, his findings should be rejected.

Contrary to this argument, the record reflects, and ALJ Molleur noted, several specific reasons for his credibility determination: (A) Petitioner made inconsistent statements; (B) Petitioner's hobbies and activities of daily living were inconsistent with her subjective complaints of pain and inability to focus; (C) Petitioner's subjective complaints were inconsistent with the medical evidence of record, because her impairments responded favorably to medication; (D) Petitioner's psychologist noted that Petitioner may have exaggerated her symptoms on a personality test; and (E) Petitioner failed to act on the referral to a psychiatric specialist from her treating physician. (AR 28–29.) ALJ Molleur concluded that all of these reasons indicated that Petitioner's allegations lack sufficient credibility to support a finding of disability. (*Id.* at 29.)

## A.    *Inconsistent Statements*

The ALJ found Petitioner lacked credibility in part because she made inconsistent statements regarding her education and her ability to perform her daily chores. A report prepared by psychologist Glena L. Andrews, Ph.D., on April 20, 2009,[2] before

_____

[2]    The report is dated April 20, 2009, but Dr. Andrews evaluated Petitioner on September

Petitioner's alleged onset date, states that Petitioner reported she finished high school and received her diploma. But, at the hearing on October 3, 2012, Petitioner testified that she had completed only the ninth grade and had not received a GED.[3] Also at the hearing before the ALJ, Petitioner testified she needed a white board to remind her to perform her chores and regular daily activities. (AR 57.) However, in her Function Report, she did not mention the need for a white board, rather she stated she needed only "encouragement" and "task focusing" for her to perform her chores and daily activities.[4] (AR 254.) The ALJ found these inconsistencies sufficient to discredit Petitioner's testimony about the severity and limiting effects of her impairments.

Although the Court acknowledges it does not have the same advantage of evaluating Petitioner's testimony first-hand as the ALJ had, these two minor inconsistencies cited by the ALJ do not, in isolation, provide clear or convincing reasons for discrediting Petitioner. As discussed below, however, the ALJ provided other specific reasons that are sufficient to support his credibility assessment.

### B. *Hobbies and Activities of Daily Living*

ALJ Molleur also found that Petitioner's subjective complaints of pain and

---

13, October 16, December 8, and December 9 of 2008. (AR 290.)

[3]      Petitioner argues "[i]t is more plausible that Dr. Andrews misunderstood [Petitioner's] level of education than that [Petitioner] lied about this fact." (Dkt. 12 at 5.)

[4]      At the October 3, 2012 hearing, Petitioner testified she had been using the white board for "about four months" and had started using it only after her boyfriend suggested it. (AR 58.) The Function Report is dated July 10, 2011, more than one year before the hearing. (AR 259.)

inability to focus were inconsistent with her hobbies and activities of daily living. In her Function report, Petitioner listed her hobbies as sewing, reading, gardening, and playing sports. Petitioner's report also states that she follows written instructions "fairly well." (AR 257.) Additionally, Petitioner's fiancé, James Lubacky, stated Petitioner is able to pay attention to puzzles "until they get hard," she helps his son with college work, and she works on the computer. (*Id.* at 248, 250.) Therefore, ALJ Molleur's finding that this testimony diminished Petitioner's credibility is substantially supported by the record.

### C. *Inconsistencies with the Medical Evidence*

ALJ Molleur also found Petitioner's complaints of pain and mental disorders inconsistent with the medical evidence because her headaches, depression, insomnia, and bipolar disorder all responded favorably to medication. The record contains several reports from Charles M. Davis, a general practitioner who treated Petitioner several times after her alleged onset date. On June 16, 2011, Dr. Davis reported Petitioner's depression was being treated with Celexa 20 and that Petitioner felt "great" and was "doing well" on this medication. (AR 408.) On August 9, 2011, Dr. Davis reported Petitioner had "[n]o depression" and was "[s]leeping much better." (AR 473.) On February 27, 2012, Dr. Davis reported Petitioner was using naproxen 500 to treat her headaches and was doing "better than before." (AR 443.) Also on this date, Dr. Davis reported Petitioner was using trazodone to treat her insomnia and that she was "[s]leeping ok most nights" and "[w]akes up refreshed." (*Id.*) On April 6, 2012, Dr. Davis reported Petitioner was using Effexor to treat her mood disorder, and was "sleeping better" and had "[b]etter energy."

(AR 454.) These records provide clear and convincing reasons to discredit Petitioner's claims of disabling migraines, depression, and bipolar disorder.

### D.     *Symptom Exaggeration*

ALJ Molleur also questioned Petitioner's credibility based on her MMPI-2 results. An MMPI-2 "is an objective personality inventory used to evaluate a person's emotional strengths and weakness." (AR 292.) According to Dr. Andrews, Petitioner's MMPI-2 results indicated that she "may have responded in a random manner" and "may have exaggerated her situations." (AR 293.) This led Dr. Andrews to conclude that the MMPI-2 was not a valid measure of Petitioner's personality profile. ALJ Molleur could reasonably conclude these results undermine Petitioner's credibility.

### E.     *Failure to Act on a Referral to a Psychiatric Specialist*

The ALJ also noted that Petitioner failed to act on Dr. Davis's referral to a psychiatry specialist when she "no-showed" for three appointments with Cornerstone Psychological Associates. (AR 392, 443–459.) ALJ Molleur's finding that this behavior undermines Petitioner's credibility may not be the only reasonable interpretation, but it is a reasonable one supported by substantial evidence. Therefore the Court will not engage in second-guess the ALJ.

Aside from the two minor inconsistent statements discussed above, the Court concludes the ALJ identified clear and convincing reasons for discrediting Petitioner. Because substantial evidence supports the ALJ's adverse credibility determination, the Court finds no legal error in this portion of the ALJ's decision.

## 2.    Duty to Develop the Record

The ALJ has an independent duty to hear and evaluate all relevant evidence and "fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983); *See* 20 C.F.R. § 405.370. This duty extends to the represented as well as to the unrepresented claimant. *Id.* However, the ALJ's obligation to fully develop the record in a social security disability benefits case requires that he or she seek additional evidence or clarification "only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001). If the record is adequate and void of ambiguity, it is the claimant's duty to prove that she is disabled. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."). Here, Petitioner, through her counsel, argues that the ALJ failed to fully develop the record by failing to order a psychological consultative examination and failing to fully address Petitioner's physical impairments.

### A.    *Consultative Examination*

An ALJ should order a consultative examination ("CE") when the results of the CE reasonably could be expected to be of material assistance in resolving the issue of disability. *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997). The Social Security regulations contains detailed guidelines on the use of CEs, which are physical or mental examinations requested and purchased by state agencies after determining that additional

medical evidence is necessary. 20 C.F.R. §§ 404.1519a, 404.1519b. The regulations

require that "[a] consultative examination may be purchased when the evidence as a

whole, both medical and nonmedical, is not sufficient to support a decision on [the]

claim." *Id.* § 404.1519a (emphasis added). Otherwise, the ALJ has the discretion to reject

a claimant's request for a CE. *Id.* §§ 404.1519a(a)(1), 404.1519m.

On August 27, 2012, approximately one month prior to the hearing before the

ALJ, Petitioner's attorney requested a psychological CE "to include neurological and IQ

testing" because of Petitioner's "history of extensive psychological impairments and

treatment." (AR 287.)  This initial request was denied. Petitioner's attorney renewed this

request at the hearing on October 3, 2012. The request was renewed because, among

other things, Petitioner's attorney wanted Petitioner's IQ scores to determine if she would

qualify for the intellectual disability listing. The ALJ also denied this additional request.

Petitioner asserts that these denials were in error for several reasons.

Petitioner contends that a psychological CE was needed to further clarify the

psychological evaluation report of Dr. Andrews dated April 20, 2009. This report did not

include results from an IQ test, but did include results of both the WAIS-III and the

WMS-III. The WAIS-III is a "grouping of subtests designed to evaluate an adult's

general level of intellectual functioning." (AR 291.) Overall, Petitioner's WAIS-III

scores indicated "low average" intellectual functioning. (*Id.*) Petitioner's working

memory was within the average range, her processing speed was in the borderline range,

and her ability to prioritize items with non-verbal information fell within the low average

range. Dr. Andrews also noted that Petitioner's "ability to compare and contrast verbal information falls in the deficit range." (*Id*.) "The WMS-III is a battery of subtests measuring learning, memory and working memory" and "is believed to be correlated with a person's level of intelligence." (*Id*. at 292.) The WMS-III results indicated, among other things, that Petitioner's "memory for information presented auditorially is much stronger than for information presented visually," her "working memory falls in the deficit range," and she "struggled significantly with visual working memory."

Petitioner requested a CE because Dr. Andrews's report indicated "[Petitioner's] intellectual functioning is in the low average range with some areas of deficit" but did not provide an IQ score. (*Id*. 293–94.) In essence, Petitioner claims that, absent the requested IQ scores, the ALJ's findings with regard to her intellectual functioning were unsupported. This argument is particularly relevant to the ALJ's findings on Listing 12.05, which directs a finding of disability when claimant meets certain criteria, including a specific IQ score of 70 or less. Listing 12.05 reads:

> **12.05** *Intellectual disability*: intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B.  A valid verbal, performance, or full scale IQ of 59 or less;

OR

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence, or pace; or
4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. part 404, subpart P, appendix 1, Listing 12.05.

During the hearing, ALJ Molleur explained: "even if [the WAIS-III scores] were in the borderline range, . . . that doesn't get you a listing" and "if the scores were somewhere in the 60s, where you need to be for a listing, . . . the report would have said that." (AR 50–51.) Even without a specific numerical score, the ALJ considered Petitioner's impairments under each subparagraph of Listing 12.05.

The ALJ concluded that Petitioner did not meet the requirement of paragraph A of the Listing, because she "indicated she has no problems with her personal care." (AR 25.) This substantial evidence supports this finding, as the record reflects that Petitioner performs chores daily, including cleaning the house, doing laundry, mowing the lawn,

gardening, preparing meals, and caring for her pets. The record also indicates that

Petitioner is able to drive a car and enjoys playing sports often. Petitioner testified that

she had previously required the assistance of a psychosocial rehabilitation worker to help

with daily activities, but there is no evidence in the record that she needed or utilized

such a worker after her alleged onset date.

ALJ Molleur concluded that Petitioner did not meet the requirements of paragraph

B or C of the listing because she did not have a valid verbal, performance, or full scale IQ

score in the appropriate range. ALJ Molleur acknowledged that Petitioner's actual scores

were not provided by Dr. Andrews, but indicated that Dr. Andrews's finding of

Petitioner's overall intellectual functioning in the low average range was not consistent

with the score required to meet Listing 12.05. *See Schneider v. Commissioner*, 223 F.3d

968, 971 (9th Cir. 2000) (noting a performance IQ score of 80 falls within the "low

average" range).

ALJ Molleur also concluded that Petitioner did not meet the marked limitation

requirements of paragraph D. To qualify as a "marked limitation," an impairment must be

"more than moderate but less than extreme." (AR 23.) The ALJ found that Petitioner has

mild restriction in her activities of daily living, moderate difficulties in social functioning,

moderate difficulties with regard to concentration, persistence or pace, and no episodes of

decompensation of extended duration. Accordingly, the ALJ concluded that Petitioner's

mental impairments do not meet the requirements of any of the subparagraphs of Listing

12.05.

Petitioner further argues that ALJ Molleur erred when he denied the request for a CE without explaining how an individual with a working memory in the "deficit range" would be able to retain the ability to follow simple instructions. Respondent counters by arguing that ALJ Molleur was not required to order a CE, because the record was not ambiguous and the ALJ had sufficient information to assess Petitioner's intellectual abilities based on the record—in particular, Dr. Andrews's report.

In denying Petitioner's request for a psychological CE, the ALJ considered Petitioner's work history and Dr. Andrews's report. The ALJ found that Dr. Andrews's report rendered a CE unnecessary, "as the claimant's overall intellectual functioning was found to be in the low average range with only some areas of deficit." (*Id*. at 29.) Even so, the ALJ conducted an analysis to see if Petitioner met the other requirements of Listing 12.05 and reasonably concluded that Dr. Andrews's findings were inconsistent with the listing criteria. Accordingly, the ALJ did not fail in his duty to fully develop the record when he denied Petitioner's request for a CE because he had sufficient information to support his disability determination without ordering a CE regarding Petitioner's alleged learning disability. The record before the ALJ was neither ambiguous nor inadequate to allow for proper evaluation of evidence. Because substantial evidence supports the ALJ's decision that Petitioner was not disabled, the ALJ did not err when he denied the request for a CE.

Petitioner also claims an evaluation conducted by Dr. Waters and Dr. Rice[5] dated

January 9, 2013—after the hearing before the ALJ and after the appeals council denial of

rehearing—confirmed that Petitioner's diagnoses "impact[ed] her daily functioning, led

to unhealthy coping skills, and interfered with gaining appropriate support." (Dkt. 12 at

3.) Indeed, this evaluation states that Petitioner "does appear to have disabling mood

symptoms." (AR 479.) However, as Respondent correctly notes, the evaluation conducted

by Dr. Waters and Dr. Rice validated ALJ Molleur's finding that Petitioner's low average

intellectual function determination did not meet the requirements of Listing 12.05;

therefore, even if the ALJ erred by not ordering the CE, the error was harmless.

The intelligence testing conducted by Dr. Waters and Dr. Rice found Petitioner's

full scale IQ score to be 91, which is well above the requirement of 70 or less to meet

Listing 12.05. The Ninth Circuit has oft-stated that "[a]n error is harmless if it is

'inconsequential to the ultimate nondisability determination.'" *Treichler v. Comm'r of*

*Soc. Sec. Admin.*, No. 12-35944, 2014 WL 7332774 at *6 (9th. Cir. Dec. 24, 2014) (citing

*Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012)). Therefore, even if the ALJ had

erred by not ordering the psychological CE, the intelligence tests conducted by Dr.

Waters and Dr. Rice confirm that the failure to order the CE was inconsequential to the

disability determination, any error is harmless.

**B.** ***Physical Impairments***

Petitioner also argues that ALJ Molleur failed to develop the record because he

---

[5]     Dr. Waters and Dr. Rice are both licensed psychologists who were employed at Living Hope Clinic at the time of this evaluation.

failed to fully address Petitioner's physical impairments. Petitioner contends that the ALJ "never addressed" the issue of pain throughout her hips and her inability to sit comfortably. (Dkt. 12 at 3–4.) Specifically, Petitioner contends that the ALJ's conclusion that Petitioner could perform the full range of light work "without any examination or development of the evidence" was a failure to fully develop the record. (*Id.*) She also argues this "blanket assessment" of work activity "without a function by function analysis" is in error. (*Id.*)

Petitioner cites "*Payne v. Commissioner*, No. 12-04909"[6] as her only support for this contention. *Payne* supports the proposition that an ALJ must consider each function (e.g. sitting, standing, walking, lifting, carrying, pushing, and pulling) separately before the ALJ can determine "which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by that exertional level." 2013 WL 6623347, at *4 (quoting SSR 96-8p). But *Payne* is neither binding nor factually on point.

In *Payne*, the record established that the claimant suffered from severe "bilateral osteoarthritis of the knees." *Id*. at *3. Consequently, a function-by-function analysis was necessary to determine how the knee impairment limited the claimant's work-related function. The court held that neither the ALJ nor any physician conducted a proper

---

[6]     Petitioner cites the *Payne* decision without indicating a database or reporter where it can be found, the court that issued it, or the year it was decided—charging this Court with the inconvenient task hunting for the case based on the limited information provided. A more useful citation would be: *Payne v. Commissioner*, No. C 12-04909 WHA, 2013 WL 6623347 (N.D. Cal. 2013).

function-by-function analysis of the claimant, because neither "approximate[d] how long plaintiff could stand or ambulate and did not indicate her lifting, carrying, or postural limitations." *Id.* Rather, the ALJ based his decision on one doctor's statement that his patient's knee "showed good motion, no deformity, no instability, no effusion . . . . [and Claimant] should be limited from doing any work that requires prolonged standing or ambulation on a semi-permanent basis." *Id.* at *2 (alterations in original) (internal quotation marks omitted).

Here, by contrast, there was no medical or testimonial evidence that hip pain or an inability to sit limited Petitioner's work-related function. During the hearing, ALJ Molleur asked Petitioner if she had any issues with pain or other limitations that would restrict her movement or prevent her from engaging in certain physical actions, and Petitioner answered in the negative. (AR 62.) But when ALJ Molleur next asked Petitioner if it was her mental issues and headaches that were "holding [her] back from being able to work," to which Petitioner responded in the affirmative. (*Id.*) Although Petitioner described what she called "TV legs," which allegedly causes pain in her hips and legs, she stated that she "[does not] let it stop [her] from working." (*Id.* at 63.) Based on this testimony and the lack of medical evidence concerning Petitioner's hip pain or inability to sit, ALJ Molleur found that Petitioner "can reasonably be limited to light work because [of] her assortment of physical complaints." (*Id.* at 30.)

The Ninth Circuit has held that an ALJ need not prepare a function-by-function analysis for alleged impairments the ALJ finds "neither credible nor supported by the

record." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (citing SSR 96-8p). The Court will not reverse when the ALJ takes "into account those limitations for which there was record support that [do] not depend on [the claimant's properly discredited] subjective complaints." *Id.*

In light of the ALJ's credibility determination and because Petitioner's allegations of hip pain and an inability to sit comfortably were not supported by her testimony or by any other medical evidence in the record, it was not necessary for the ALJ to conduct a function-by-function analysis before making his residual functional capacity determination. The evidence presented on these alleged impairments did not trigger the ALJ's duty to develop the record any further, and the Court finds no legal error was committed by the ALJ.

## ORDER

Based upon the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED** that the Commissioner's decision finding that Petitioner is not disabled within the meaning of the Social Security Act is **AFFIRMED** and that the petition for review is **DISMISSED**.

Dated: **March 16, 2015**

Honorable Candy W. Dale
United States Magistrate Judge